UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA RECEIVED
NORTHERN DIVISION

2022 JUL 26  P 4: 50

| | | |
|---|---|---|
| CELESTINE GEORGE as Administrator of | § | DEBRA P. HACKETT, CLK |
| the Estate of CHARLES L. BRAGGS, | § | U.S. DISTRICT COURT |
| Deceased; | § | MIDDLE DISTRICT ALA |
| | § | **Case No.**   2:22-cv-00434-WKW-CWB |
| Plaintiff, | § | |
| v. | § | |
| | § | |
| WEXFORD HEALTH SOURCES, INC.; | § | Demand for Trial by Jury |
| JEFFERSON DUNN; and, RUTH NAGLICH, | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFF'S COMPLAINT AT LAW

NOW COMES the Plaintiff, **CELESTINE GEORGE**, as Administratrix of the Estate

of Charles L. Braggs, Deceased; by and through her attorney, and for Plaintiff's Complaint at

Law against Defendants WEXFORD HEALTH SOURCES, INC., JEFFERSON DUNN, and

RUTH NAGLICH, and, pleading hypothetically and in the alternative, states as follows:

### JURY DEMAND

1.      Plaintiff hereby demands a **trial by jury** on each and every count plead in

this instant Complaint at Law.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction over federal questions pursuant to 28 U.S.C. §1331

and over deprivations of constitutional rights pursuant to 28 U.S.C. §1343.

3.      Pursuant to 28 U.S.C. §1367(a), this Court has supplemental jurisdiction over

the state law claims, since these claims are so related to the claims in the §1983 action that

they form part of the same case and controversy.

4.      Venue is proper in this Court under 28 U.S.C. §1391(b) because all defendants

are residents or have a principal place of business in the state of Alabama.  Moreover, a substantial part of the events giving rise to this action occurred in the Middle District of Alabama.

## THE PARTIES

5.      At all relevant times, Plaintiff CELESTINE GEORGE, the mother of decedent Charles L. Braggs, was a citizen of the United States and a resident of Mobile, Alabama.

6.      Plaintiff CELESTINE GEORGE is the Administrator of the estate of her deceased son, Charles Braggs.

7.      At the time of his death, Charles Braggs was a citizen of the United States and a resident of Mobile County, Alabama.

8.      At all relevant times, Defendant JEFFERSON DUNN ("Dunn"), sued in his individual capacity, was the Commissioner of the Alabama Department of Corrections ("ADOC").

9.      At all relevant times, Defendant RUTH NAGLICH ("Naglich") sued in her individual capacity, was the Associate Commissioner of Health Services of the Alabama Department of Corrections ("ADOC").

10.     At all relevant times, Defendant WEXFORD HEALTH SOURCES, INC. ("Wexford) was a corporation licensed and organized under the laws of the state of Florida.

11.     At all relevant times, Defendant WEXFORD operated a registered office located in the city of Montgomery, County of Montgomery, Alabama.

12.     At all relevant times from mid-2018 to through 2021, Defendant WEXFORD contracted with the Alabama Department of Corrections including, but not limited to the St. Clair, Holman, Limestone, and Kilby Correctional Facilities; and Defendants DUNN and NAGLICH to administer, refer, and approve medical care and treatment for inmates in the

2

custody of the St. Clair, Holman, Limestone, and Kilby Correctional Facilities.

## FACTS COMMON TO ALL COUNTS[1]

### A. Alabama Department of Corrections Mental Health Care Structure

13.     At all relevant times, Defendant Dunn served as the Commissioner of the Alabama Department of Corrections, overseeing the Department's vital functions, including prisoner treatment.

14.     At all relevant times, Defendant Naglich served as ADOC's Associate Commissioner for Health Services, heading the Office of Health Services ("OHS"), which is responsible for overseeing the provision of both medical and mental-health care to prisoners.

15.     From mid-2018 to 2022, Defendant Wexford was ADOC's contractor for mental health care.

16.     At all relevant times, under the mental-health contracts between ADOC's Office of Health Services and WEXFORD, OHS had access to WEXFORD's internal documents and records, and WEXFORD was obligated to send reports, like monthly operating reports and annual contract compliance reports, to the Office of Health Services.

17.     At all relevant times, Defendant Naglich was in charge of contract monitoring and exercising oversight of WEXFORD's provision of services.

### B. Failures by the Alabama Department of Corrections to Provide Adequate Mental Health Care to Inmates

18.     In June 2017, the Middle District of Alabama issued a liability opinion in the *Braggs v. Dunn* litigation in which it found that ADOC's mental-health care for prisoners in its custody was "[simply put...horrendously inadequate" and violated the Eighth

---

[1] Counsel for Plaintiffs are developing a record and analyzing prevailing legal precedent regarding a potential damages-class certification. Plaintiffs reserve the right to move the Court to certify a damages class at the appropriate time, if at all.

Amendment. *Braggs v. Dunn*, 257 F. Supp. 3d 1171, 1267 (M.D. Ala. June 27, 2017).

19.     More specifically, the Middle District of Alabama found that "ADOC's inadequate crisis care and long-term suicide-prevention measures have created a substantial risk of serious harm, including self-harm, suicide, and continued pain and suffering." *Id.* at 1220.

20.     The serious deficiencies identified by the Court included ADOC's failure to properly identify and classify prisoners with mental illness, inadequate treatment panning, inadequate psychotherapy, failure to provide crisis care to those who needed it, placement of prisoners in crisis in dangerous and harmful settings, including unsafe crisis cells, inadequate monitoring of suicidal prisoners; inappropriate release of prisoners from suicide watch, inappropriate use of disciplinary actions for symptoms of mental illness, inappropriate use of segregation for mentally ill prisoners, and inadequate follow-up care for prisoners released from suicide watch. *Id.*, at 1218-31.

21.     The Court found that these risks are particularly heightened for prisoners with "serious mental illness," (SMI), "a subset of particularly disabling conditions...defined by the diagnosis, duration, and severity of the symptoms," including conditions like schizophrenia, bipolar disorder, and major depressive disorder. *Id.* at 1186 n. 6, 1246.

22.     On December 27, 2021, the *Braggs* Court issued a remedial opinion finding "continued correctional understaffing in all ADOC facilities ... places mentally ill inmates in ADOC custody at substantial risk of serious harm, including decompensation, victimization, self-injury, and death." *Braggs v. Dunn*, 2:14-cv-00601, doc. 3462 at 78 (M.D. Ala., Thompson, J.).

   **a. Contributing Conditions to Severe Mental Health Treatment Inadequacy**

23.     At all relevant times, ADOC experienced high rates of inmate overcrowding,

4

with occupancy rates of up to 175% of the population that its facilities were designed to hold.

24.     WEXFORD was understaffed at the time of the suicide attempt and death of Charles Braggs.

25.     WEXFORD's mental-health caseload per provider has steadily increased since 2003, due to an increasing number of prisoners with mental health needs, and increased severity of prisoner mental-health needs, multiple budget cuts over the years, and a stagnant number of authorized mental health staff positions.

26.     Between 2008 and 2016, the mental-health caseload increased by 25% across all ADOC facilities.

27.     Since 2008, MHM repeatedly requested an increase from Defendants Naglich and Dunn of authorized mental health staff positions—a request defendants Naglich and Dunn refused.

28.     In 2009, Defendants Naglich and Dunn failed to implement a planned initiative to transfer some of MHM's lower-acuity mental health caseload to ADOC staff.

29.     Since at least 2003, ADOC has not had a sufficient number of mental-health staff for a system its size.

30.     At all relevant times, the combination of overcrowding and understaffing taxed WEXFORD's and ADOC's ability to provide adequate mental health care to severely mentally ill individuals, including Charles Braggs through:

    a.   Reduced ability to identify mental illness at intake and referrals;

    b.   Missed counseling appointments and group sessions; and

    c.   Inadequate monitoring of prisoners in mental-health crises.

31.     In 2010, ADOC issued a report noting that correctional staffing fell well short

of the required levels, with shortage rates of 12% at close-custody facilities and as high as 21.2% at medium security facilities.

32.     This same statement appeared in nearly each annual ADOC report until 2013.

33.     In 2013, ADOC reported correctional officer shortage rates across facilities at 43.3%.

34.     In 2015, ADOC reported that shortage rates among its facilities was as high as 68%, with only one of its fifteen prisons (Hamilton Aged and Infirm Center) having a shortage rate of less than 25%.

35.     ADOC reported in September of 2016 that it had filled only about half of its authorized positions for correctional officers; the staffing level continued to drop throughout 2016.

36.     At all relevant times, correctional officers were needed to provide security for mental-health programming and escort prisoners from their cells to appointments if they are not in the general population.

37.     At all relevant times, insufficient correctional staffing led to mental health appointments and group activities being cancelled, impairing treatment for severely mentally ill individuals.

38.     At all relevant times, insufficient correctional staffing compromised available correctional officers' abilities to respond to incidents, crises, and emergencies.

39.     At all relevant times, insufficient correctional staffing had a pronounced effect on individuals in segregation and crisis cells, as officers were unable to check on isolated prisoners frequently enough to guarantee their safety.

40.     At all relevant times, mentally decompensating prisoners frequently went unnoticed, leading to a delay in access of treatment and more frequent crises.

6

41.   In March 2020, Wexford sent a letter to Naglich explaining how continued, extreme correctional understaffing undermines the adequacy of mental-health care in ADOC facilities across the board. The absence of correctional staff and the resulting violence and stress among ADOC inmates resulted in decompensation and suicidality, leading to skyrocketing demand for suicide watch--more than 4,000 % above the suicide watch hours anticipated in Wexford's contract.

**b.  Poor Identification and Classification of Prisoners' Mental Health Needs**

42.   At all relevant times, ADOC had one of the lowest mental-illness prevalence rates among correctional systems in the country, because substantial numbers of prisoners with mental illness are missed at intake, and referrals for evaluation are neglected.

43.   At all relevant times, all male ADOC inmates are screened for mental health concerns at Kilby Correctional Facility.

44.   At all relevant times, mental health screening for prisoners at intake at Kilby is conducted by licensed practical nurses ("LPNs") with limited mental health training, who go unsupervised by higher-level providers.

45.   At all relevant times, intake forms LPNs filled out included questions that require clinical assessments that LPNs are not qualified to make.

46.   At all relevant times, WEXFORD staffing was insufficient for the mental-health screenings conducted at St. Clair.

47.   At all relevant times, because of insufficient staffing, WEXFORD frequently sent prisoners to other facilities without conducting an initial mental health intake screening.

48.   At all relevant times, this failure of identification increased the risk of continued emotional and mental suffering and potential suicide among seriously mentally ill inmates.

7

49.     Moreover, at all relevant times, ADOC had no system to triage and identify the urgency of mental health treatment requests, or to make referrals according to the level of urgency of the request.

50.     MHM's contract-compliance reports noted annually from 2010 to 2016 that processed referral slips for mental health treatment did not reflect acuity levels, and the logs of referrals did not record relevant date and time information, making it impossible to ensure timely processing.

51.     At all relevant times, ADOC had no system of tracking and processing referrals to ensure urgent requests are passed on to providers, or that providers handle referrals in a timely manner.

52.     At all relevant times, severe overcrowding and understaffing made it difficult for correctional officers to notice changes in inmate behavior that might indicate a need for mental health treatment.

53.     At all relevant times, Defendants were aware that prisoners often engaged in self-harm or destructive behavior to gain the attention of mental-health staff and get needed treatment, including self-injury, fire-setting, and suicide attempts.  At all relevant times, ADOC's system of coding the level of functioning of a mental health treatment failed to accurately reflect prisoners' mental health needs.

54.     At all relevant times, ADOC inadequately referred prisoners to residential treatment unit beds and failed to provide residential level care to prisoners who required it.

55.     At all relevant times, available residential treatment unit beds remained unoccupied, which was noted for years in MHM's monthly operating reports prior to Charles Braggs' death.

**c.  Inadequate Treatment Planning**

8

56.    At all relevant times, ADOC's treatment plans for severely mentally ill prisoners were not individualized to each prisoner's symptoms and needs.

57.    At all relevant times, treatment plans for severely mentally ill prisoners did not change to account for changes in the prisoner's mental health state.

58.    At all relevant times, treatment plans for severely mentally ill prisoners did not reflect changes in prisoner's environment, like moves to segregation or crisis watch.

59.    At all relevant times, treatment team meetings at facilities happened infrequently, with key members of the team missing or failing to participate.

60.    At all relevant times, treatment team meetings occurred without the participation of a provider with expertise in psychotropic medication.

61.    At all relevant times, transfers of prisoners between facilities were frequent within ADOC.

62.    At all relevant times, the generic nature of treatment plans required new counselors to create treatment plans with inadequate information following a prisoner transfer, resulting in inconsistent treatment.

63.    These failures subjected mentally ill prisoners to a high risk of exacerbated symptoms and serious injury from self-harm.

64.    At all relevant times, Defendants were aware of these failures and of the risks posed to seriously mentally ill inmates, including Charles Braggs by these failures.

### d.  Inadequate Psychotherapy

65.    At all relevant times, Defendants were aware that psychotherapy was essential for the treatment of mental illness.

66.    As a result of overcrowding and understaffing, the frequency and quality of

counseling sessions for seriously mentally ill prisoners decreased steadily since the early 2000s.

67.     At all relevant times, at some ADOC facilities, WEXFORD counselors had caseloads twice as high as what they should have been.

68.     At all relevant times, as a result of overcrowding and understaffing, individual counseling appointments and group therapy sessions were frequently delayed or cancelled.

69.     At all relevant times, as a result of overcrowding and understaffing, counseling sessions with seriously mentally ill prisoners were often cursory and did not reflect clinical judgements or adequately assess patient progress.

70.     At all relevant times, these problems were particularly acute for prisoners in segregation, because inmates in segregation must be escorted from their cells by correctional officers.

71.     At all relevant times, mental health contacts were often conducted cell-side; however, these contacts were insufficient as counseling and did not constitute mental health treatment.

72.     At all relevant times, despite ADOC's contract with MHM stating that all mental health professionals must be licensed, only a small percentage of mental health professionals practicing in ADOC held licensure.

73.     At all relevant times, unlicensed mental health professionals practicing within ADOC went unsupervised by licensed psychologists, despite state regulations requiring such oversight.

74.     These failures subjected seriously mentally ill prisoners to a high risk of exacerbated symptoms and serious injury from self-harm.

75.     At all relevant times, Defendants were aware of these failures and of the risks

posed to seriously mentally ill inmates, including Charles Braggs by these failures.

### e. Inadequate Inpatient Care

76.     At all relevant times, ADOC and its agents and employees often placed segregation inmates without mental health needs into mental-health units, allowing inmates without severe mental illness to use beds that should have been used for providing treatment for those with severe mental illness.

77.     MHM noted annually to ADOC from 2012 to 2016 that this practice was ongoing and was negatively impacting MHM's ability to provide appropriate treatment of severely mentally ill prisoners.

78.     Defendants were aware at all relevant times that out-of-cell time was vital for treatment of patients with severe mental illness.

79.     At all relevant times, Defendants were aware that in prison systems around the country, the standard out-of-cell time for individuals in mental-health units is twenty hours per week.

80.     At all relevant times, Defendants were aware that severely mentally ill inmates, including Charles Braggs, often received only five hours per week of out-of-cell time.

81.     Nonetheless, at all relevant times, severely mentally ill prisoners, including Charles Braggs, received very little out-of-cell time, spending virtually all day inside his cell.

82.     At all relevant times, ADOC maintained and carried out policies that limited the possessions of severely mentally ill individuals, meaning that these individuals, including Charles Braggs, had few options to keep them engaged.

83.     At all relevant times, Defendants recognized that hospitals were able to provide a higher level of monitoring and treatment for severely mentally ill and suicidal

patients than what ADOC, MHM and Wexford could provide.

84.     At all relevant times, despite administrative regulations stating that individuals who spend more than 30 days in a stabilization unit should be considered for psychiatric hospitalizations, ADOC seldom provided these transfers to prisoners.

85.     These failures subjected seriously mentally ill prisoners to a high risk of exacerbated symptoms and serious injury from self-harm.

86.     At all relevant times, Defendants were aware of these failures and of the risks posed to seriously mentally ill inmates, including Charles Braggs, by these failures.

### f.   Inadequate Suicide Prevention and Crisis Care

87.     Defendants were aware that inmate suicide risk increases in correctional facilities with crowding, low staffing rates, and frequent inmate transfers.

88.     At all relevant times, correctional officers and mental health staff had the ability to place any prisoner on suicide watch.

89.     At all relevant times, a mid- or high-level provider was required to conduct a mental health assessment, including the use of a suicide risk assessment tool.

90.     At all relevant times, a prisoner in crisis could alternatively be placed in a crisis cell on "mental health observation," a short-term monitoring status for patients with less acute conditions than those on suicide watch, or patients recently released from suicide watch.

91.     At all relevant times, ADOC and WEXFORD rarely used a suicide- risk assessment tool when prisoners threatened suicide, engaged in self-harm, or were placed in crisis cells, thus failing to identify prisoners at an elevated risk of suicide.

92.     At all relevant times, prisoners on suicide watch were frequently kept in crisis cells for more than 72 hours, despite regulations urging that individuals on suicide watch for

more than 72 hours should be considered for mental-health placement.

93.   At all relevant times, ADOC had an insufficient number of crisis cells at all facilities for the number of inmates.

94.   Defendants were aware that ADOC's suicide rate multiplied sevenfold from 2013 to 2016, with a suicide rate of more than double the national average in other state and federal correction systems.

95.   Defendant Naglich and MHM managers agreed at trial in the *Braggs* matter that ADOC's number of crisis cells in each of ADOC's 15 institution was insufficient to support their mental health needs.

96.   At all relevant times, due to a shortage of crisis cells, suicidal prisoners were often transferred from their home institution to crisis cells at different institutions.

97.   Defendants were aware that the aforementioned transfer system exacerbated correctional officer shortages, jeopardized prisoner mental states, and interferes with the continuity of care.

98.   At all relevant times, severely mentally ill and suicidal inmates, including Charles Braggs, did not receive necessary and consistent out-of-cell appointments with mental health counselors.

99.   At all relevant times, the vast majority of inmate suicides in ADOC custody were accomplished by hanging.

100.   At all relevant times, a significant number of segregation or crisis cells occupied by severely mentally ill individuals in ADOC custody had easily accessible tie-off points on which an inmate could hang themselves, including sprinkler heads, hinges, fixtures, and vents.

101.   From 2011 to 2016, MHM's contract-compliance reports to ADOC noted that

13

crisis cells in ADOC facilities were unsafe for suicidal inmates.

102.    At all relevant times, ADOC's administrative regulations and the applicable jurisdictional standard of care for mental health care in prisons require that suicide watch should take place at random or otherwise staggered intervals of roughly fifteen minutes.

103.    At all relevant times, ADOC's administrative regulations and the applicable jurisdictional standard of care for mental health care in prisons require that, for prisoners on mental health observations, checks should occur at staggered or otherwise random intervals of roughly thirty minutes.

104.    At all relevant times, despite these regulations, ADOC correctional officers and WEXFORD mental health specialists performed suicide watch and mental health observation checks at pre-ordained times, without staggering intervals, or otherwise did not perform checks at these intervals.

105.    At all relevant times, the standard of care dictated by the NCCHC, which for mental health care for the most severely acutely suicidal prisoners, including Charles Braggs, required constant supervision by correctional officers or mental health providers.

106.    At all relevant times, WEXFORD was contractually obligated to follow all NCCHC standards.

107.    At all relevant times, Defendants were aware that suicidal prisoners should be released from suicide watch only with the approval of a psychiatrist or nurse practitioner who has made a face-to-face assessment and confirm that the inmate's condition is stable enough for release to be appropriate.

108.    In 2016, MHM reported to ADOC that suicidal inmates were being discharged from suicide watch without face-to-face-assessments.

109.    In 2016, MHM reported to ADOC that suicidal inmates were being discharged

14

from suicide watch based on information communicated from low-level mental health staff to on-call doctors and nurse practitioners.

110.    These practices continued after WEXFORD became ADOC's primary provider of mental health care.

111.    Defendants were aware at all relevant times that release from suicide watch without the authorization of a psychiatrist or nurse practitioner increased the risk of premature release from suicide watch, which in turn increased the risk of self-harm to severely mentally ill and suicide prisoners, including Charles Braggs.

112.    Defendants were aware at all relevant times that release from suicide watch was necessary to stabilize and improve the mental health of severely mentally ill prisoners, including Charles Braggs, and that failure to provide this care created substantial risk that self-injurious or suicidal behavior would continue.

**g.  Inappropriate Use of Disciplinary Actions**

113.    At all relevant times ADOC and WEXFORD maintained a written policy indicating that severely mentally ill prisoners would not be punished for symptoms of a mental illness, including self-harm.

114.    Notwithstanding this policy, at all relevant times, a significant number of severely mentally ill ADOC prisoners were disciplined for behavior stemming from known mental illness, including self-injurious behavior.

115.    Defendants were aware that such practices increased the risk of decompensation in severely mentally ill prisoners and caused needless emotional suffering.

116.    Defendants were aware at all relevant times that desperate acts of self-harm by severely mentally ill prisoners, including Charles Braggs, often resulted in discipline or placement in segregation.

**h. Inappropriate Placement and Inadequate Treatment in Segregation**

117.    At all relevant times, all ADOC facilities utilized segregation housing, also referred to as "restrictive housing" or "solitary confinement."

118.    At all relevant times, segregation at all ADOC facilities consisted of the practice of keeping prisoners in single-person cells for approximately 22.5 hours per day, allowing inmates out only to bathe and for brief recreation.

119.    Defendants were aware at all relevant times that the isolation and lack of mental stimulation of the segregation experience has a strong, negative impact on mental health, and that this effect is more pronounced in individuals with severe mental illness.

120.    Defendants were aware at all relevant times that inmates with severe mental illness were highly likely to decompensate when placed in segregation.

121.    At all relevant times, Defendants were aware that the overwhelming consensus in the field of psychology establishes that prisoners with serious mental health needs should never be placed in segregation.

122.    At all relevant times, overcrowding and understaffing issues described herein caused a decrease in the amount and quality of the mental health treatment to individuals placed in segregation.

123.    At all relevant times, mental health providers at ADOC facilities experienced difficulty observing inmates in segregation, and in turn experienced difficulty detecting decompensation and exacerbation of symptoms of mental illness.

124.    At all relevant times, ADOC had no system in place to assess the mental health needs of severely mentally ill inmates to determine if segregation was appropriate.

125.    At all relevant times, even where mental health evaluation revealed that a severely mentally ill inmate in segregation as decompensating, Defendants Dunn and Naglich

imposed no internal requirements that its correctional officers or mental health staff remove a prisoner from segregation.

126.    At all relevant times, while only 14% of the ADOC population was identified as having mental health needs, mentally ill prisoners made up 21% of the population in segregation.

127.    At all relevant times, inmates in segregation, even severely mentally ill inmates, including Charles Braggs, had less access to mental health treatment than inmates not housed in segregation.

128.    Despite requirements within ADOC that they occur at least twice per week, segregation rounds, or periods during which mental health staff travel to segregation cells to assess the needs of inmates in segregation, occurred at all relevant times at all ADOC facilities rarely, if at all.

129.    At all relevant times, the vast majority of successful suicide attempts in ADOC facilities occurred in segregation units.

130.    In 2017, the *Braggs* court held explicitly that:

> it is categorically inappropriate to place prisoners with serious mental illness in segregation absent extenuating circumstances; even in extenuating circumstances, decisions regarding the placement should be with the involvement and approval of appropriate mental-health staff, and the prisoners should be moved out of segregation as soon as possible and have access to treatment and monitoring in the meantime.

*Braggs*, 257 F. Supp. 3d at 1247.

## C.  ADOC Defendants' Deliberate Indifference to Inmates' Serious Medical Needs and Treatment Deficiencies

131.    At all relevant times, ADOC received monthly statistical reports and annual contract-compliance reports from WEXFORD.

132.    At all relevant times, ADOC frequently communicated with high-level

WEXFORD officials through correspondence, quarterly meetings, and corrective-action plans following audits.

133.    On information and belief, ADOC has performed no audits of WEXFORD's overall contract compliance since entering into a contract for mental health services with WEXFORD.

134.    At all relevant times, ADOC and its agents and employees, including Defendants Dunn and Naglich, understood that overcrowding of inmates and understaffing of mental health and correctional staff presented adverse impacts on severely mentally ill inmates.

135.    Defendant Naglich admitted in trial testimony in *Braggs* that she was aware that MHM's performance of its services had been historically deficient and that MHM had an inadequate quality control process.

136.    Defendant Naglich likewise admitted in her *Braggs* testimony that, despite her knowledge of MHM's deficient performance in providing prisoner health care, she did not monitor MHM to ensure they provided minimally adequate mental health care to prisoners.

137.    Defendant Naglich admitted in her *Braggs* testimony she had been aware that MHM had been chronically understaffed since 2013 and remained understaffed at the time of her testimony.

138.    Defendants Dunn and Naglich were aware that, since at least 2010, MHM and WEXFORD had been unable to meet their contractual requirements due to staffing deficiencies and high caseloads.

139.    Defendant Dunn noted in his testimony that ADOC's ability to provide adequate mental health care to inmates suffered due to both overcrowding and understaffing.

140.    From 2011 to 2016, MHM reported annually to Defendant Naglich and the

18

OHS that multiple facilities were suffering from staffing shortages which "compromise[ed] [MHM's] ability to provide monthly follow-up for all caseload inmates."

141.    These staffing shortages persisted following WEXFORD's assumption of ADOC's mental health caseload; Defendants Dunn and Naglich were aware this problem went unrectified.

142.    Defendants Dunn and Naglich acknowledged in their *Braggs* testimony that insufficient staffing of correctional officers compounded the problem of insufficient mental-health staffing.

143.    Defendants Dunn and Naglich had been informed repeatedly by MHM and WEXFORD prior to the death of Charles Braggs that deficiencies in staffing were placing severely mentally ill inmates at a high risk of decompensation.

144.    Defendants Naglich and Dunn had been informed that ADOC's, and WEXFORD's processes for identifying and classifying mentally ill prisoners were deficient.

145.    From 2011 to 2016, Defendant MHM annually reported to ADOC, including Defendants Dunn and Naglich, that treatment plans for mentally ill inmates were deficient across all levels of care, from outpatient to crisis care.

146.    Treatment plans for mentally ill inmates remained deficient across all levels of care following WEXFORD's assumption of ADOC's mental health caseload; Defendants Dunn and Naglich were aware this deficiency persisted.

147.    At all relevant times, monthly statistical reports from Wexford to Defendants Dunn and Naglich informed them that little to no group counseling was occurring at any ADOC facility.

148.    At all relevant times, Defendant Dunn has personally reviewed suicide incident reports and has been aware of a steady increase in suicides; he was directly aware that most

of these suicides were committed by hanging in segregation.

149.    Defendant Naglich admitted that, at all relevant times prior to the death of Charles Braggs, that not having a constant-watch procedure for acutely suicidal inmates was a serious problem, posing a risk of harm and death.

150.    On a nearly monthly basis for years prior to the death of Charles Braggs, MHM warned Defendants Dunn and Naglich of the risk of decompensation, self-harm, and death, that segregation practices pose to mentally ill prisoners, and that all facilities nonetheless placed mentally ill prisoners in segregation.

151.    Prior to the death of Charles Braggs, Defendants Dunn and Naglich had been repeatedly informed by mental health staff that patients in segregation, across all facilities, were not receiving treatment.

152.    Defendants were aware prior to the death of Charles Braggs that suicide watch or mental health checks occurring at highly regular, pre-ordained intervals would allow suicidal or otherwise severely mentally ill inmates to predict cell checks and otherwise self-harm in observation aps.

153.    At all relevant times, despite prohibitions at the administrative and standard of care level prohibiting pre-ordained, regular suicide watch or mental health checks, Defendants permitted and undertook theses pre-ordained, regular checks, or otherwise did not make these checks at all.

154.    At all relevant times, Defendants were aware that constant supervision was not being provided for acutely suicidal prisoners, despite contractual obligations and applicable jurisdictional standards of care requiring constant supervision.

155.    At all relevant times prior to Charles Braggs' death, Defendant Dunn evinced an intent to the Middle District of Alabama to keep constant-watch procedures in place for

acutely suicidal prisoners until otherwise ordered by the Courts.

156.    Despite this articulated promise, at all relevant times, Defendant Dunn and his fellow Defendants did not maintain constant watch on acutely suicidal prisoners.

157.    Despite this evinced promise, and despite the projected annual budget for a constant-watch procedure of over $4,000,000.00, prior to Charles Braggs' death, Defendant Dunn allocated only a few hundred thousand dollars to meet the immediate needs of the interim agreement entered into by ADOC to provide constant watch.

158.    As early as 2013, Defendants Dunn, Naglich, and MHM concluded as a result of an audit of mental health services that ADOC "automatically" applied discipline to male inmates engaging in self-injurious behavior.

159.    Despite this assessment, Defendants did not implement any plan to reduce or eliminate disciplinary punishment for self-injurious behavior, or behavior manifesting from mental illness.

160.    Defendant Naglich admitted in the course of the *Braggs* testimony that, in the years preceding the death of Charles Braggs and MHM had been aware of the practice of automatically applying disciplinary sanctions for self-injury and mentally ill prisoners' overrepresentation in segregation.

161.    Defendant Naglich admitted in her *Braggs* testimony in 2017 that placing seriously mentally ill prisoners in segregation is "categorically inappropriate" and amounts to "denial of minimal medical care."

162.    The Middle District of Alabama held in *Braggs* that ADOC's Office of Health Services had historically done "vanishingly little to exercise oversight of the provision of care to mentally ill prisoners," and that "ADOC has known that MHM's own quality-control process is hopelessly inadequate in implementing corrective actions."

163.    Despite this knowledge, and despite Defendants Dunn and Naglich's own dissatisfaction with MHM's contract compliance, Defendants Dunn and Naglich elected to extend ADOC's contract with MHM in September 2016.

164.    At all relevant times, WEXFORD did not monitor the implementation of corrective actions for its mental health provision to inmates.

165.    For years prior to the death of Charles Braggs, Defendants Dunn and Naglich did not review WEXFORD's contract compliance reports in full or take corrective actions based on their findings.

166.    Although ADOC's contracts with MHM and WEXFORD have permitted ADOC officials to access MHM's and WEXFORD's files, to conduct scheduled and unscheduled performance reviews, and to assess fines for contract noncompliance, Defendants Dunn and Naglich have not done so.

167.    Defendant Naglich was aware of ADOC's increasing suicide rate in the years leading up to Charles Braggs' death, as well as the risk factors for suicides, but made no effort to address the problem.

168.    Despite the entry of an interim suicide prevention agreement in early 2017 between the ADOC and a class of plaintiffs in *Braggs*, Defendants continued to demonstrate noncompliance, including the lack of a constant-watch procedure for acutely suicidal individuals, the continued placement of severely mentally ill prisoners in segregation, and the lack of staggered-interval checks of inmates on suicide watch.

**D. Continued Deficiencies by Wexford and Naglich**

169.    At least twelve (12) suicides occurred within ADOC between September 2019 and 2020.

170.    Defendant WEXFORD was aware of the aforementioned deficiencies in

ADOC and MHM's provision of mental health care at the time it entered into a contract with ADOC to provide mental health care in or about mid-2018.

171.    Defendant WEXFORD was familiar with MHM's previous reports to and audits by ADOC and Defendant Naglich at the time it entered into its contract with ADOC.

172.    Despite this awareness, Defendant WEXFORD condoned and perpetuated these deficiencies, including but not limited to the understaffing of correctional and mental health staff, the placement of severely mentally ill inmates in segregation, the failure to maintain adequate mental health plans, and the failure to implement adequate suicide prevention measures.

173.    As head of OHS, Defendant Naglich was aware of the deficiencies in ADOC's and MHM's provision of mental health care.

174.    Defendant Naglich was familiar with mental health reports submitted to and audits by ADOC and had access to relevant information compiled about mental health care of ADOC inmates.

175.    Defendant Naglich was familiar with the *Braggs* litigation and the obligations placed on ADOC by the order of the Middle District of Alabama.

176.    Despite this awareness, Defendant Naglich condoned and perpetuated these aforementioned deficiencies, including but not limited to the understaffing of correctional and mental health staff, the placement of severely mentally ill inmates in segregation, the failure to maintain adequate mental health plans, and the failure to implement adequate suicide prevention measures.

### E.  The Death of Charles L. Braggs

177.  Charles Braggs was 28 years old when he hanged himself on July 27, 2020, in his cell in the restrictive housing unit at St. Clair Correctional Facility, where he had been

living for more than two years.

178.    He was not on the mental-health caseload at the time he hung himself.

179. He had been in restrictive housing for all but one month since his incarceration at ADOC began in 2011.

180. In the months leading up to his death, Braggs routinely had scheduled out-of-cell time canceled for lack of correctional staff. Inmates in restrictive housing cells are supposed to be allowed out of their cells for five hours each week for exercise.

181. In the seven months before his death, Braggs rarely received these required five hours per week out of his cell. In some weeks, records indicate that he received no time at all out of his cell due to understaffing, except for occasional showers or health-care appointments.

182. Braggs was supposed to receive mental-health assessments every 90 days to ensure that the stress of segregation has not caused them to need increased mental-health care.

183. In the time Braggs spent in his cell at the St. Clair restrictive housing unit, he received two mental health assessments: one in December 2018, and one in March 2019.

184. During his mental health assessments, Braggs reported auditory hallucinations, sleep disturbances, and reported possible paranoid/delusional thought content and exhibited blunted affect and disheveled appearance.

185. There is no evidence that consideration was given to removing him from the restrictive housing unit or that he was referred to or evaluated by the mental health provider.

186. ADOC was required to conduct mental-health rounds in restrictive housing at least weekly, stopping at each inmate's cell to determine whether the inmate might require mental-health care. The last documented round conducted in the St. Clair restrictive housing unit was on May 21, 2020, more than two months before Braggs' death.

187. Lack of adequate correctional staff was the reason given for the numerous missed mental-health rounds.

188. On the morning of July 27, 2020, the day Braggs died, he placed a medical request on a sick call form to see a nurse because he had been "having seizures lately." He was not seen for this request.

189. According to a prisoner in the cell next to his, who was interviewed by ADOC's chief psychiatrist after Braggs' death, Braggs had been asking for mental-health services for two weeks before he died.

190. After speaking with Braggs during medical rounds on the evening of July 27, the nurse asked a correctional officer at 7:15 p.m. to have Braggs brought to the infirmary.

191. At 7:25 p.m., the nurse asked the officer again to bring Braggs to the infirmary and was told that Braggs couldn't be brought over "because he didn't have any clothes."

192. At 8:00 p.m., the nurse asked the captain on duty to instruct his officers to bring Braggs to the infirmary.

193.   At 8:15 p.m., the officers found Braggs dead in his cell.

### Count 1: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
### *(Celestine George vs. Defendant Wexford)*

194.   Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 193 above, as if fully restated herein.

195.   At all relevant times, Wexford administered, referred, and approved medical care for inmates at the St. Clair Correctional Facility.

196.   At all relevant times, Wexford, as well as its agents and employees, acted under color of state law and within the course and scope of their employment.

197.   At all relevant times, Wexford had in effect official policies or longstanding practices and customs that condoned and fostered the unconstitutional conduct of agents and

employees of Wexford and/or St. Clair Correctional Facility, including:

    a. Failing to identify prisoners, including Charles Braggs, with serious mental-health needs and to classify their needs properly;

    b. Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Charles Braggs;

    c. Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Charles Braggs;

    d. Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Charles Braggs;

    e. Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Charles Braggs;

    f. Placing seriously mentally ill prisoners, including Charles Braggs, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Charles Braggs, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Charles Braggs.

198.    At all relevant times, agents and employees of Wexford were acting pursuant to these policies, practices, or customs.

199.    Wexford failed to properly train or supervise its agents and employees on the provision of needed psychological treatment to detainees.

200.    Defendant had actual and/or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, the Defendant condoned, tolerated and through its own actions or inactions thereby ratified such policies.

201.    Through the aforementioned history of widespread abuse, Defendant Wexford was aware of the need to correct the deficient policies, but failed to do so.

202.    Through the aforementioned history of widespread abuse, Defendant Wexford was aware that their agents would act unlawfully and in a manner that deprived inmates of their constitutional rights, but failed to stop their agents from doing so.

203.    As such, Wexford was deliberately indifferent and reckless with respect to the

potential violation of constitutional rights of detainees, including Charles Braggs.

204.    At all relevant times, Charles Braggs had a right to be free from violations of his constitutional rights.

205.    The violation of Charles Braggs' constitutional rights was the plainly obvious consequences of Defendant Wexford's failures.

206.    The acts or omissions of Defendant as described herein Charles Braggs of his constitutional rights and caused him other damages.

207.    As a proximate result of Defendant's unlawful conduct, Charles Braggs suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, loss of constitutional and federal rights, physical injuries, extraordinary pain and suffering, and emotional distress.

208.    Plaintiff is further entitled to attorneys' fees and costs pursuant to 42 U.S.C. §1988, pre-judgment interest and costs as allowable by federal law.

209.    In addition to compensatory, damages, Plaintiff entitled to punitive damages against the Defendants, as their actions were taken maliciously, willfully and with a reckless or wanton disregard of the constitutional rights of Plaintiff.

WHEREFORE, CELESTINE GEORGE respectfully requests that this Court enter judgment against Defendant Wexford, including awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 2: Wrongful Death
*(Celestine George vs. Wexford)*

210.    Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 193 above, as if fully restated herein.

211.    At all times, Defendants had a duty to refrain from acts and omissions which

27

could cause the inmates of St. Clair Correctional Facility unnecessary and unwarranted harm.

212.     The acts or omissions of Defendants as described herein caused Charles Braggs' injuries, including his death.

213.          As a proximate result of Defendants' unlawful conduct, Charles Braggs suffered actual physical and emotional injuries and death, and other damages and losses entitling Plaintiff to compensatory damages in amounts to be determined at trial. These injuries include, but are not limited to, physical injuries, extraordinary pain and suffering, and emotional distress.

WHEREFORE, Plaintiff CELESTINE GEORGE respectfully requests that this Court enter judgment against Defendants, DUNN and NAGLICH, awarding compensatory damages, attorneys' fees, punitive damages, and for any further relief this Court deems just.

### Count 3: 42 U.S.C. § 1983 – VIOLATION OF EIGHTH AMENDMENT
#### (CELESTINE GEORGE vs. Defendants Dunn and Naglich)

214.     Plaintiff re-alleges and incorporates herein the allegations contained in paragraphs 1 through 193 above, as if fully restated herein.

215.     At all relevant times, Defendants DUNN, and NAGLICH, and their agents, employees, agents, and/or officers, were acting pursuant to an expressly adopted official policy or a longstanding practice or custom of Defendants DUNN and NAGLICH.

216.     At all times relevant, it was the duty of Defendants DUNN and NAGLICH to refrain from subjecting others to a deprivation of Constitutional rights, including Charles Braggs.

217.     At all relevant times, in breach of said duty, Defendants DUNN and NAGLICH subjected decedent Charles Braggs to deprivation of rights in violation of the privileges and immunities secured to Charles Braggs by the Eighth Amendment to the United States Constitution by engaging in the following policies, practices, and customs:

28

a. Failing to identify prisoners, including Charles Braggs, with serious mental-health needs and to classify their needs properly;

b. Failing to provide individualized treatment plans to prisoners with serious mental-health needs, including Charles Braggs;

c. Failing to provide psychotherapy by qualified and properly supervised mental-health staff with adequate frequency and sound confidentiality to mentally ill inmates, including Charles Braggs;

d. Providing insufficient out-of-cell time and treatment to those who needed residential treatment, and failing to provide hospital-level care to those who needed it, including Charles Braggs;

e. Failing to identify suicide risks adequately and providing inadequate treatment and monitoring to inmates who were suicidal, engaging in self-harm, or otherwise undergoing a mental-health crisis, including Charles Braggs;

f. Imposing disciplinary sanctions on mentally ill prisoners, including Charles Braggs, for symptoms of their mental illness, and imposing disciplinary sanctions without regard for the impact of sanctions on prisoners' mental health; and

g. Placing seriously mentally ill prisoners, including Charles Braggs, in segregation without extenuating circumstances and for prolonged periods of time, placing prisoners with serious mental-health needs, including Charles Braggs, in segregation without adequate consideration of the impact of segregation on mental health, and providing inadequate treatment and monitoring in segregation for mentally ill inmates, including Charles Braggs.

218.   Defendants DUNN and NAGLICH, together with various other officials, whether named or unnamed, had either actual or constructive knowledge of the deficient policies, practices and customs alleged above. Despite having knowledge of the above, these Defendants condoned, tolerated and through their own actions or inactions thereby ratified such policies.

219.   Through the aforementioned history of widespread abuse, Defendants DUNN and NAGLICH were aware of the need to correct the deficient policies, but failed to do so.

220.   Through the aforementioned history of widespread abuse, Defendants DUNN and NAGLICH were aware that their subordinates would act unlawfully and in a manner that deprived inmates of their constitutional rights, but failed to stop their subordinates from doing so.

221.   At all times, Defendants DUNN and NAGLICH were aware of the risk of serious harm to seriously mentally ill prisoners, including Charles Braggs, resulting from the

aforementioned policies.

222. Such Defendants also acted with deliberate indifference to the foreseeable effects and consequences of these policies with respect to the constitutional rights of decedent, Charles Braggs, as well as its detrimental impact on the confidence the public has in the correctional body that serves it.

223. As a direct and proximate result of the Constitutional violations caused by Defendants DUNN and NAGLICH, the employees, agents and/or officers of ADOC and the St. Clair Correctional Facility, and other policymakers, decedent Charles Braggs was deprived of his liberty and suffered damages, including death.

224. As a direct result of the Constitutional violations caused by Defendants DUNN, and NAGLICH, the employees, agents and/or officers of ADOC and the St. Clair Correctional Facility, and other policymakers, decedent Charles Braggs' heirs suffered personal and pecuniary losses.

WHEREFORE, CELESTINE GEORGE respectfully requests that this Court enter judgment against Defendants, including awarding compensatory damages, punitive damages, and for any further relief this Court deems just.

Dated: September 29, 2021

Respectfully Submitted,

/s/Joseph Mitchell McGuire

Joseph Mitchell McGuire (ASB 8317-S69M)
McGUIRE & ASSOCIATES, LLC
31 Clayton Street
Montgomery, AL 36104
(334) 517-1000 office
jmcguire@mandabusinesslaw.com

*Attorneys for Plaintiff*

30

## **VERIFICATION**

Before me, the undersigned notary, on this day personally appeared Celestine George, Administrator of the Estate of Charles L. Braggs, the affiant, a person whose identity is known to me. After I administered an oath to affiant, affiant testified:

"My name is Celestine George. I have read the Complaint. The facts and allegations stated in it are true and correct to the best of my knowledge."

_Celestine George_
Celestine George

SWORN TO and SUBSCRIBED before me by Celestine George on July 10, 2022.

Notary Public in and for
the State of Alabama